FILED
CLERK, U.S. DISTRICT COURT

APR -3 2008
3:00

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## (WESTERN DIVISION)

REBA BAGLEY, SCOTT SILVER, TOLAN BECK, and ROD HUGHES, on Behalf of Themselves and All Others Similarly Situated,

Plaintiffs,

vs.

KB HOME, KB HOME 401(K) SAVINGS PLAN COMMITTEE, BRUCE KARATZ, JAMES A. JOHNSON, RAY A. IRANI, LESLIE MOONVES, GUY NAFILYAN, DOMENICO CECERE, CORY F. COHEN, WILLIAM R. HOLLINGER, and BARRY A. MUNITZ,

Defendants.

Civil Action No.: CV-07-1754 GPS (SSx)

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**

Plaintiffs are participants in the KB Home ("KB Home" or the "Company") 401(k) Savings Plan (the "Plan")[1] and bring this action on behalf of themselves and a class of all others similarly situated participants (the "Participants"), alleging as follows:

### INTRODUCTION

1.      This is a class action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against the Plan fiduciaries, including KB Home.

2.      Plaintiffs were employees of KB Home who participated in the Plan and whose retirement investment portfolios included KB Home stock during the Class Period (as defined below).

3.      Plaintiffs' claims arise from the failure of Defendants, who are Plan fiduciaries, to

---

[1]      The Plan was formerly known as the Kaufman and Broad Home Corporation 401(k) Savings Plan.

**COPY**

act solely in the interest of the Participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as required by ERISA.

4.     Plaintiffs allege that Defendants, as fiduciaries of the Plan, breached their duties to Plaintiffs and to the other Participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of KB Home stock.

5.     The claims in this Amended Complaint arise from Defendants' involvement in the long-standing improper practice of backdating stock options at KB Home and misleading the Plan and its Participants about the Company's options practices and financial results.

6.     On August 24, 2006, KB Home publicly disclosed that it had been notified by the Unites States Securities and Exchange Commission ("SEC") of an informal investigation into its historical stock option grants and procedures.

7.     Following the disclosure of the investigation, KB Home announced that it was unable to file timely financial reports with the SEC, would need to restate its financial results and that an internal investigation by the Company's Audit and Compliance Committee had concluded that the Company had engaged in the improper backdating of options. Specifically, the investigation concluded that "the actual measurement dates for financial accounting purposes of certain stock option grants likely differ from the recorded grant dates," and "[a]s a result, additional non-cash charges for stock based compensation relating to these grants may need to be recorded."

8.     On November 12, 2006, the Company announced that its internal investigation had concluded that for nearly a decade stock options granted to executives had been backdated or otherwise improperly priced:

> The investigation has concluded that the Company used incorrect measurement dates for financial reporting purposes for annual stock option grants during the period from 1998 to 2005. The Company expects that the incremental non-cash compensation expense arising from these errors is not likely to exceed an aggregate of $50 million, spread over the vesting periods of the options in question. The errors may also require an increased tax provision. The Company is evaluating, with its independent auditors, whether a restatement of certain previously-filed financial statements will be required.

9. Then, amid growing concern over the Company's stock option grants, on December 8, 2006, KB Home publicly admitted that its fiscal 1999 to 2005 financial statements (which had been incorporated into Plan documents and communications to Plan Participants) contained material false statements and therefore "should no longer be relied upon and will be restated." According to public disclosures, the restatement included a massive charge of approximately $41 million for compensation expense, as well as approximately $75 million in tax charges and impacts.

10. In the wake of these disclosures, several senior KB Home officers who were closely affiliated with the stock option backdating scheme resigned, including its Chief Executive Officer, defendant Bruce Karatz ("Karatz"); its Chief Legal Officer, Richard B. Hirst ("Hirst"); and Gary A. Ray ("Ray") who was its Senior Vice President in charge of Human Resources.

11. The backdating scheme unjustly enriched the Plan's fiduciaries, including Karatz (the Company's Chairman and Chief Executive Officer), to the detriment of the Plan and its Participants. At the same time that Karatz was causing the Plan to acquire and hold KB Home stock, Karatz sold more than $230 million of his own KB Home stock and, upon information and belief, some of the Plan's assets were used to purchase and acquire this stock.

3

12.     Defendants collectively realized over *$248 million in illicit compensation* through the exercise of illegally backdated options grants and subsequent sale of KB Home stock, including sales of stock to the Plan and its Participants in exchange for Plan assets.

13.     Defendants' backdating scheme not only surreptitiously and illegally lined Defendants' pockets and caused KB Home to issue materially false financial statements, but undermined the key purpose of stock option-based executive compensation, *i.e.*, to provide incentive to improve the Company's performance and increase the Company's stock price and market capitalization.  By manipulating options such that they carried a strike price lower than the trading price of the stock on the date of grant, KB Home insiders and the Plan's fiduciaries profited immediately upon the award of the options without doing anything to improve the Company's business or financial condition.

14.     By engaging in this scheme, Defendants were able to conceal that KB Home was not recording material compensation expenses and was materially overstating the Company's net income and understating its net loss from 1996 through 2005.

15.     Throughout the Class Period, KB Home's Plan communications, annual reports and proxy materials and other SEC filings were false and misleading and the Company reported financial results which violated Generally Accepted Accounting Principles ("GAAP") and required a formal restatement.

16.     At the same time that these fiduciaries were awarding backdated stock options to themselves and others at KB Home, they were misleading Plan Participants and causing the Plan to acquire and hold KB Home stock at higher prices.

17.     When the market learned about the improper options backdating at the Company, the Company's stock price plummeted, taking with it the retirement savings in the Plan.

4

18.     During the Class Period, Defendants knew or should have known that KB Home stock was an imprudent investment alternative for the Plan due to the rampant business improprieties occurring at the Company, including a massive scheme to backdate options which enabled Defendants to reap millions of dollars for themselves on sales of KB Home stock at the same time that these Defendants were causing the Plan and its Participants to acquire and hold the stock.

19.     Defendants are liable under ERISA to restore the lost profits and the losses of vested benefits sustained by the Plan as a result of Defendants' breaching of their fiduciary obligations.

20.     Plaintiffs seek alternative types of relief under ERISA.

21.     First, Plaintiffs and the Plan seek their lost profits as a result of Defendants' breaches. In particular, Plaintiffs and the Plan seek the profit they lost by investing in KB Home stock instead of in other funds within the Plan that were available at the time and which have outperformed the returns on KB Home stock.

22.     Second, Plaintiffs and the Plan seek to recover the losses that they incurred by investing their retirement funds in KB Home stock at a time when the stock price was artificially inflated.

23.     Third, Plaintiffs and the Plan seek to recover the losses caused to the Plan and its Participants when the price of KB Home's stock declined significantly as the market began to learn about KB Home's options backdating practices and its false financial results.

24.     Fourth, Plaintiffs seek a Constructive Trust -- both individually and on behalf of the Plan -- over all amounts by which the Plan fiduciaries benefited as a result of their breaches. In particular, Plaintiffs seek to impose a Constructive Trust on the amounts received by

5

Defendants for selling their KB Home stock, including amounts that Defendants received when they sold KB Home common stock at the same time that those Defendants were causing the Plan to use Plan assets to acquire that stock.

25.    In addition, Plaintiffs seek equitable relief and such other relief as is appropriate under ERISA.

## JURISDICTION AND VENUE

26.    **Subject Matter Jurisdiction**: This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a). This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

27.    **Personal Jurisdiction**: ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are residents of the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of California. Defendant KB Home has its headquarters within this District.

28.    **Venue**: Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district and some or all of the fiduciary breaches for which relief is sought occurred in this district.

## PARTIES

### Plaintiffs

29. Plaintiff Reba Bagley was a KB Home employee who is a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held KB Home stock in her retirement investment portfolio during the Class Period. She is not asserting a claim against KB Home but is asserting a claim against the other fiduciary defendants.

30. Plaintiff Scott Silver was a KB Home employee who is a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held KB Home stock in his retirement investment portfolio during the Class Period. He is not asserting a claim against KB Home but is asserting a claim against the other fiduciary defendants.

31. Plaintiff Tolan Beck was a KB Home employee who is a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held KB Home stock in his retirement investment portfolio during the Class Period.

32. Plaintiff Beck was a participant in the Plan until after the original complaint in this action was filed.

33. Plaintiff Beck had not been named as a plaintiff in this lawsuit before filing this Amended Complaint but he is a member of the Class defined in the Complaint filed by plaintiffs Bagley and Silver on March 16, 2007 while Mr. Beck was a participant in the Plan.

34. By the time that plaintiff Beck withdrew from the Plan in June 2007, the value of his investment in KB Home stock had already declined significantly because of Defendants' breaches of fiduciary duty.

35. When plaintiff Beck withdrew from the Plan, he did not receive the full amount of his vested retirement benefits.

7

36. Plaintiff Rod Hughes was a KB Home employee who is a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held KB Home stock in his retirement investment portfolio during the Class Period.

37. Plaintiff Hughes had not been named as a plaintiff in this lawsuit before filing this Amended Complaint but he is a member of the Class defined in the original complaint filed by plaintiffs Bagley and Silver.

38. By the time that plaintiff Hughes withdrew from the Plan in December 2006, the value of his investment in KB Home stock had already declined significantly because of Defendants' breaches of fiduciary duty.

39. When plaintiff Hughes withdrew from the Plan in December 2006, he did not receive the full amount of his vested retirement benefits.

40. As a result of the Court's February 22, 2008 Order, only plaintiffs Beck and Hughes assert claims against defendant KB Home in this action.

**Defendant KB Home**

41. Defendant KB Home is a Delaware corporation with its principal place of business located at 10990 Wilshire Boulevard, Los Angeles, California.

42. KB Home is one of America's largest homebuilders.

43. KB Home's stock trades on the New York Stock Exchange under the symbol "KBH".

44. Defendant KB Home is a fiduciary of the Plan because it is named as the Plan Administrator.

45. The Plan documents and the Forms 5500 filed by the Plan with the Department of Labor ("DOL") identify KB Home as the Plan Administrator.

8

46.     KB Home had effective control over the Plan-related activities of its directors, officers and employees and at all times acted through its Board of Directors as well as its officer and employees (including its Chief Executive Officer and members of any KB Home committees), appointed to perform Plan-related fiduciary functions in the course and scope of their employment.

47.     Through its Board of Directors or otherwise, KB Home had the authority and discretion to hire and terminate those officers and employees and had the authority and discretion to appoint, monitor, and remove officers and employees in their individual fiduciary roles with respect to the Plan.  Accordingly, the actions of the Board of Directors, the Company's committees and other employee fiduciaries are imputed to KB Home under the doctrine of respondeat superior.

48.     KB Home is a named or de facto fiduciary of the Plan within the meaning of ERISA.

49.     KB Home exercises discretionary authority with respect to managing and administering the Plan and its assets, including the selection of the Plan's investments.

**Defendant Karatz**

50.     Defendant Bruce Karatz ("Karatz") has served as Chief Executive Officer of KB Home since 1986, and as Chairman of the Board of Directors since 1993.

51.     On or about November 12, 2006, defendant Karatz abruptly "resigned" from the Company due to his involvement in the options backdating scandal at the Company.

52.     As a member of the Board of Directors and an executive of KB Home, defendant Karatz granted, received and then concealed the backdated stock options at issue in this case by issuing false statements about the Company's stock options and stock option granting practices

9

and procedures.

53.     Defendant Karatz reviewed, approved and helped to prepare KB Home's annual and quarterly reports, proxy statements and other SEC filings issued since at least 1986.

54.     Defendant Karatz signed the Company's Form 10-Q for the quarterly periods ending in February, May and August 2001; February, May and August 2002; February, May and August 2003; February, May and August 2004; February, May and August 2005; and February and May 2006; as well as the Company's annual reports on Form 10-K for 2001 through 2005, all of which included false and misleading statements.

55.     Additionally, defendant Karatz signed the Company's Form S-8 filed January 25, 2005 regarding the KB Home 1999 Incentive Plan and the KB Home 2001 Stock Incentive Plan; and October 27, 2005 regarding the KB Home 1998 Employee Stock Plan, the KB Home Performance-Based Incentive Plan for Senior Management, the KB Home 1998 Stock Incentive Plan, the KB Home 1999 Incentive Plan, the KB Home 2001 Incentive Plan, the KB Home Non-Employee Directors Stock Plan and the KB Home 401(k) Savings Plan, each of which incorporated false and misleading statements.

56.     ***Defendant Karatz personally and financially benefited from the backdating scheme by receiving 5,610,000 backdated options and by selling 5.7 million shares of his own KB Home stock, for proceeds of at least $230.4 million***, based upon his knowledge of material nonpublic information regarding the backdating scheme. Upon information and belief, those sales included shares that were sold to the Plan and its Participants using Plan assets. Karatz sold those shares at the same time that he was causing the Plan to use Plan assets to acquire and hold KB Home stock.

57.     Upon information and belief, defendant Karatz was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

58.     Defendant Karatz also was a fiduciary of the Plan because he signed or made fiduciary communications during the Class Period, including SEC filings that the Plan documents specifically incorporated by reference.

**Defendant Johnson**

59.     Defendant James A. Johnson ("Johnson") has served as one of the Company's directors since 1992.

60.     As a member of the Board of Directors of KB Home and its Management Development and Compensation Committee, defendant Johnson granted and then concealed the backdated stock options at issue in this case by issuing false statements about the Company's stock options and stock option granting practices and procedures.

61.     Defendant Johnson reviewed, approved and helped to prepare KB Home's annual and quarterly reports, proxy statements and other SEC filings issued since at least 1992.

62.     Defendant Johnson signed the Company's annual reports on Form 10-K for the periods from 2001 through 2005 which contained materially false and misleading statements.

63.     Defendant Johnson signed the Company's Form S-8 filed on October 27, 2005 regarding the KB Home 1998 Employee Stock Plan, the KB Home Performance-Based Incentive Plan for Senior Management, the KB Home 1998 Stock Incentive Plan, the KB Home 1999 Incentive Plan, the KB Home 2001 Incentive Plan, the KB Home Non-Employee Directors Stock Plan and the KB Home 401(k) Savings Plan.

11

64.     Defendant Johnson personally and financially benefited from the backdating scheme by selling 26,000 shares of his own KB Home stock for proceeds of at least $483,360 based upon his knowledge of material nonpublic information regarding the backdating scheme. Upon information and belief, those sales included shares that were sold to the Plan and its Participants using Plan assets. Defendant Johnson sold those shares at the same time that he was causing the Plan to use Plan assets to acquire and hold KB Home stock.

65.     Upon information and belief, defendant Johnson was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

66.     Defendant Johnson also was a fiduciary of the Plan because he signed or made fiduciary communications during the Class Period, including SEC filings that the Plan documents specifically incorporated by reference.

**Defendant Irani**

67.     Defendant Ray R. Irani ("Irani") has served as one of the Company's directors since 1992. As a member of the Board of Directors of KB Home and its Executive and Management Development and Compensation Committees, defendant Irani granted and then concealed the backdated stock options at issue in this case by issuing false statements about the Company's stock options and stock option granting practices and procedures.

68.     Defendant Irani reviewed, approved and helped to prepare KB Home's annual and quarterly reports, proxy statements and other SEC filings issued since at least 1992.

69.     Defendant Irani signed the Company's annual reports on Form 10-K for the periods from 2001 through 2005, which contained materially false and misleading information.

12

Additionally, defendant Irani signed the Company's Form S-8 filed October 27, 2005 regarding the KB Home 1998 Employee Stock Plan, the KB Home Performance-Based Incentive Plan for Senior Management, the KB Home 1998 Stock Incentive Plan, the KB Home 1999 Incentive Plan, the KB Home 2001 Incentive Plan, the KB Home Non-Employee Directors Stock Plan and the KB Home 401(k) Savings Plan, each of which incorporated false and misleading statements.

70. Upon information and belief, defendant Irani was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

71. Defendant Irani also was a fiduciary of the Plan because he signed fiduciary communications during the Class Period, including SEC filings that the Plan documents specifically incorporated by reference.

**Defendant Moonves**

72. Defendant Leslie Moonves ("Moonves") has served as one of the Company's directors since 2004.

73. As a member of the Board of Directors of KB Home and its Management Development and Compensation Committee, defendant Moonves granted and then concealed the backdated stock options at issue in this case by issuing false statements about the Company's stock options and stock option granting practices and procedures.

74. Defendant Moonves reviewed, approved and helped to prepare KB Home's annual and quarterly reports, proxy statements and other SEC filings issued since at least 2004.

75. Defendant Moonves signed the Company's annual reports on Form 10-K for the periods 2004 and 2005 which contained materially false and misleading information.

13

76.     Defendant Moonves signed the Company's Form S-8 filed January 25, 2005 regarding the KB Home 1999 Incentive Plan and the KB Home 2001 Stock Incentive Plan; and October 27, 2005 regarding the KB Home 1998 Employee Stock Plan, the KB Home Performance-Based Incentive Plan for Senior Management, the KB Home 1998 Stock Incentive Plan, the KB Home 1999 Incentive Plan, the KB Home 2001 Incentive Plan, the KB Home Non-Employee Directors Stock Plan and the KB Home 401(k) Savings Plan, each of which incorporated false and misleading statements.

77.     Upon information and belief, defendant Moonves was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

78.     Defendant Moonves also was a fiduciary of the Plan because he signed fiduciary communications during the Class Period, including SEC filings that the Plan documents specifically incorporated by reference.

**Defendant Nafilyan**

79.     Defendant Guy Nafilyan ("Nafilyan") served as Chairman, President and Chief Executive Officer of Kaufman and Broad, S.A. (the predecessor to KB Home), and Executive Vice President of KB Home from April 1992 through 2002. He also served as a Director of KB Home from 1987 to 2003.

80.     As an executive and member of the Board of Directors of KB Home, defendant Nafilyan granted, received and then concealed the backdated stock options at issue in this case by issuing false statements about the Company's stock options and stock option granting practices and procedures.

14

81.    Defendant Nafilyan reviewed, approved and helped to prepare KB Home's annual reports, proxy statements and other SEC filings issued between at least 1992 and 2002.

82.    Defendant Nafilyan signed the Company's annual reports on Form 10-K for 2001 and 2002 which contained materially false and misleading statements.

83.    ***Defendant Nafilyan personally and financially benefited from the backdating scheme as he received approximately 60,000 backdated options and sold 368,000 shares of KB Home stock, for proceeds of at least $5.4 million***, based upon his knowledge of material nonpublic information regarding the backdating scheme. Upon information and belief, those sales included shares that were sold to the Plan and its Participants using Plan assets. Defendant Nafilyan sold those shares at the same time that he was causing the Plan to use Plan assets to acquire and hold KB Home stock.

84.    Upon information and belief, defendant Nafilyan was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

85.    Defendant Nafilyan also was a fiduciary of the Plan because he signed fiduciary communications during the Class Period, including SEC filings that the Plan documents specifically incorporated by reference.

**Defendant Hollinger**

86.    Defendant William R. Hollinger ("Hollinger") has been Senior Vice President and Corporate Controller of KB Home since 1992. In January 2007, defendant Hollinger became KB Home's Chief Accounting Officer.

87.    As an executive of KB Home, defendant Hollinger received and then concealed

the backdated stock options at issue in this case by issuing false statements about the Company's stock options and stock option granting practices and procedures.

88.     Defendant Hollinger reviewed, approved and helped to prepare KB Home's annual reports, proxy statements and other SEC filings issued since at least 1992.

89.     Defendant Hollinger signed the Company's reports on Form 10-Q for the periods ending in May and August 2001; and February 2002; as well as the annual report on Form 10-K for 2001, each of which contained materially false and misleading statements.

90.     Defendant Hollinger personally and financially benefited from the backdating scheme because he received approximately 109,998 backdated options and sold 272,530 shares of KB Home stock, for proceeds of at least $11.4 million, based upon his knowledge of material nonpublic information regarding the backdating scheme. Upon information and belief, those sales included shares that were sold to the Plan and its Participants using Plan assets. Defendant Hollinger sold those shares at the same time that he was causing the Plan to use Plan assets to acquire and hold KB Home stock.

**Defendant Munitz**

91.     Defendant Barry A. Munitz ("Munitz") was a director of KB Home from 1999 to February 2006.

92.     As a member of the Board of Directors of KB Home, defendant Munitz granted and/or received and then concealed the backdated stock options at issue in this case.

93.     Defendant Munitz reviewed, approved and helped to prepare KB Home's annual reports, proxy statements and other SEC filings issued from 1999 to February 2006.

94.     Defendant Munitz signed the Company's annual reports on Form 10-K for 2001 through 2005, which contained materially false and misleading statements.

16

95.     Defendant Munitz signed the Form S-8 filed January 25, 2005 regarding the KB

Home 1999 Incentive Plan and the KB Home 2001 Stock Incentive Plan; and October 27, 2005

regarding the KB Home 1988 Employee Stock Plan, the KB Home Performance-Based Incentive

Plan for Senior Management, the KB Home 1998 Stock Incentive Plan, the KB Home 1999

Incentive Plan, the KB Home 2001 Incentive Plan, the KB Home Non-Employee Directors Stock

Plan and the KB Home 401(k) Savings Plan, each of which incorporated false and misleading

statements.

96.     Upon information and belief, defendant Munitz was a fiduciary of the Plan within

the meaning of ERISA in that he exercised discretionary authority with respect to: (i)

management and administration of the Plan; and/or (ii) management and disposition of the Plan's

assets.

97.     Defendant Munitz also was a fiduciary of the Plan because he signed fiduciary

communications during the Class Period, including SEC filings that the Plan documents

specifically incorporated by reference.

## **KB Home 401(k) Savings Plan Committee**

98.     Upon information and belief, defendant KB Home 401(k) Savings Plan

Committee (also known as the Administrative Committee of the KB Home 401(k) Savings Plan)

(the "Committee") consists of various officers and employees who manage the operation and

administration of the Plan. The Committee is a named fiduciary of the Plan and exercised

discretionary authority and control with respect to managing and administering the Plan and its

assets.

## **Defendant Cohen**

99.     Defendant Cory F. Cohen ("Cohen") has been Senior Vice President of Tax at KB

17

Home since 1991.

100. During the Class Period, defendant Cohen was a member of the Committee.

101. As an executive of KB Home, defendant Cohen received and/or concealed backdated stock options at issue in this case by issuing false statements about the Company's stock options and stock option granting practices and procedures.

102. Defendant Cohen assisted in preparing KB Home's annual proxy statements and other SEC filings issued since at least 1991.

103. Defendant Cohen signed the Plan's annual report on Form 11-K for 2000 and 2001 (which contained materially false and misleading statements), as well as the Plan's Forms 5500 for 2001, 2002, 2004 and 2005.

104. Defendant Cohen signed the Plan's annual reports on Form 11-K for 2000 and 2001 as the authorized representative of the "trustees (or other persons who administer the employee benefit plan)."

105. Defendant Cohen signed the Plan's annual reports on Form 5500 as the plan administrator.

**Defendant Cecere**

106. Defendant Domenico Cecere ("Cecere") has been Senior Vice President and Chief Financial Officer of KB Home since April 2002.

107. Upon information and belief, defendant Cecere was a member of the Committee during the Class Period.

108. Defendant Cecere signed the Plan's annual reports on Form 11-K that were filed with the SEC on June 27, 2003, June 28, 2004, June 29, 2005, May 25, 2006 and June 22, 2007 on behalf of the Administrator of the Plan.

18

109. As an executive of KB Home and Committee member, defendant Cecere received and/or concealed the backdated stock options at issue in this case by issuing false statements about the Company' stock options and stock option granting practices and procedures.

110. Defendant Cecere reviewed, approved and helped to prepare KB Home's annual reports, proxy statements and other SEC filings issued since at least April 2002.

111. Defendant Cecere signed the Company's reports on Form 10-Q for the periods ending in February, May and August 2001; February, May and August 2002; February, May and August 2003; February, May and August 2004; February, May and August 2005; and February and May 2006; as well as the annual report on Form 10-K for the periods 2001 through 2005, each of which contained materially false and misleading statements.

112. Additionally, defendant Cecere signed the Company's Form S-8 filed January 25, 2005 regarding the KB Home 1999 Incentive Plan and the KB Home 2001 Stock Incentive Plan; and October 27, 2005 regarding the KB Home 1988 Employee Stock Plan, the KB Home Performance-Based Incentive Plan for Senior Management, the KB Home 1998 Stock Incentive Plan, the KB Home 1999 Incentive Plan, the KB Home Non-Employee Directors Stock Plan and the KB Home 401(k) Savings Plan, which incorporated false and misleading statements.

## Unknown Fiduciaries

113. There are fiduciaries of the Plan whose identities are currently unknown to Plaintiffs. These unknown individuals include members of the Committee. Once their identities are ascertained, Plaintiffs will seek leave to join them under their true names.

114. Defendants include named and de facto fiduciaries with respect to the Plan. All Defendants exercised discretionary authority or control regarding management of the Plan, management of the Plan's assets, and/or administration of the Plan.

19

115.   During the Class Period, each Defendant acted as a fiduciary of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

## THE PLAN

116.   The Plan is an "employee pension benefit plan," as defined by §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. § 1002(3) and 1002(2)(A).   The Plan is a legal entity which can sue or be sued.   ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).   However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant.   Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan.   Stated differently, in this action, Plaintiffs seek relief on behalf of the Plan.

117.   Alternatively, Plaintiffs seek relief on behalf of themselves and the other participants in the Plan in accordance with ERISA and the recent Supreme Court decision in LaRue v. DeWolff, Boberg, 128 S. Ct. 1020 (Feb. 20, 2008).

118.   According to the Plan's annual report on Form 11-K for the year ended December 31, 2005, the Plan is a defined contribution plan in which all employees of the Company are eligible to participate on the first day of the month following the date of hire.   Participants electing to participate in the Plan may contribute up to 15% of their annual compensation, on a pretax basis, by means of payroll deduction.   Participants may also contribute up to an additional 15% of their annual compensation, on an after-tax basis, also by means of payroll deduction.

119.   Unless otherwise elected by the Board of Directors, the Company will match the participant's pretax contribution up to 6% of annual base salary (determined without regard to bonuses and a maximum of $50,000 of regular earnings for commission employees).   Company matching contributions and related investment income vest to Participants over five years.

120.   Plan Participants may direct the investment of their funds among one or more of

the several fund options offered by the Plan.

## CLASS ACTION ALLEGATIONS

121. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All persons who are Participants in or beneficiaries of the Plan at any time between 2001 through the present (the "Class Period") and whose accounts held Company stock or securities.

122. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, there were (at a minimum) thousands of members of the Class who participated in, or were beneficiaries of the Plan during the Class Period. The Company's Form 5500 filed for the calendar plan year 2005 represented that the Plan had 7,329 Participants.

123. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Class;

(b) Whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plan's Participants and beneficiaries; and

(c) Whether Defendants violated ERISA.

124. Plaintiffs' claims are typical of the claims of the members of the Class because

21

Plaintiffs and the other members of the Class each sustained lost profits and/or a loss of vested benefits arising out of Defendants' wrongful conduct as complained of herein.

125. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

126. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class parties to the actions, or substantially impair or impede their ability to protect their interests.

127. Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

128. KB Home, at the direction of its Board of Directors, made liberal use of stock options as a form of compensation in order to recruit and retain executives and key employees. Each option gave the recipient the right to buy one share of KB Home common stock at a set

22

price, called the "exercise" or "strike" price, on a future date after the option vested. The option was "in-the-money" whenever the trading price of KB Home common stock exceeded the option's exercise price. The option was "at-the-money" whenever the trading price of KB Home common stock and the exercise price were the same. The option was "out-of-the-money" or "underwater" whenever the trading price of KB Home common stock was less than the exercise price.

129.    During the Class Period, Defendants falsely represented that KB Home's option grants were made at fair market value on the date of grant. As the Plan and its Participants would later learn, these representations were materially false and misleading.

**The KB Home Stock Option Plans**

130.    Between 1996 and 2005, KB Home granted stock options to its executives pursuant to several different stock option plans. These stock option plans included the 1995 Performance-Based Incentive Plan for Senior Management ("1995 Plan"), the 1998 Stock Incentive Plan ("1998 Plan"), the 1999 Incentive Plan ("1999 Plan"), the Amended and Restated 1999 Incentive Plan ("Amended 1999 Plan"), and the 2001 Stock Incentive Plan ("2001 Plan"), each of which was prepared by KB Home's management and adopted by the Board of Directors.

131.    The stated purpose of each plan was to attract and retain exceptional executive personnel and other key employees of the Company and its affiliates and to incentivize them to achieve performance goals.

132.    Each plan gave KB Home's Board of Directors, or a designated committee thereof, full power to interpret and administer the plans and full authority to select the specific executives and employees to whom awards would be granted under the plans, the type and amount of the award to be granted to such employees, and the terms of the option agreements to

23

be entered into with such employees.

## Backdated Stock Option Grants at KB Home

133.    Throughout the Class Period, Defendants falsely represented that options were awarded at the fair market value of KB Home stock on the date of the grant.

134.    A review of the annual stock option grants to top executives of KB Home between 1996 and 2005, however, shows that the stock option grants were dated: (i) near or on the very day that KB Home stock hit its low price for the month; or (ii) in advance of sharp stock price increases.

135.    This astonishing multi-year pattern of stock option grants on dates with highly favorable exercise prices – at or near a periodic low, or preceding a sharp increase in the share price – indicates that the purported grant dates of stock options were not the actual dates on which the option grants were made.  Rather, the pattern indicates that the grants were repeatedly backdated to dates with exceedingly low stock prices.  Indeed, the exercise price of many of the grants to Defendants in the Class Period were below the weighted average price of the stock in the corresponding year.

136.    As demonstrated below, year after year, stock options were granted at different times of the year with the only consistency being that the grants were at or near a periodic low or preceded a run-up in the share price.  Indeed, based on similar evidence, KB Home subsequently admitted that option grants to its Chairman and CEO, defendant Karatz, and other senior executives and employees carried the wrong "measurement dates," a euphemism for backdating.

## Backdated FY 2001 (Feb. 23, 2001 and Oct. 30, 2001) Stock Option Grants

137.    During fiscal 2001, the trading price of KB Home common stock ranged from a price of $12.45 to $18.53 per share, with a weighted average closing price of $15.21.  A total of 2,116,666 split-adjusted options were purportedly granted on October 30, 2001, to at least eight

24

executives, including defendant Karatz. The split-adjusted exercise price was $13.95 per share, which is $1.26 less than the weighted average closing price for the fiscal year. The price of the stock 20 trading days after the grant was $15.68 per share, for a 20-day cumulative return based on the exercise price of 12.4%. The exercise price was the lowest price for the month of October 2001. A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted (split-adj.) | Exercise Price (split-adj.) | Total Grant Value at Date of Grant (split-adj.) | Total Grant Value 20 Trading Days After Grant (split-adj.) |
|---|---|---|---|---|---|
| 10/30/01 | Bruce Karatz | 1,200,000 | $13.95 | $16,740,000 | $18,816,000 |
| 10/30/01 | Jeffrey Mezger | 500,000 | $13.95 | $697,500 | $7,841,000 |
| 10/30/01 | John Goodwin | 100,000 | $13.95 | $1,395,000 | $168,000 |
| 10/30/01 | Robert Freed | 50,000 | $13.95 | $697,500 | $784,000 |
| 10/30/01 | William Hollinger | 80,000 | $13.95 | $1,116,000 | $1,254,400 |
| 10/30/01 | Gary Ray | 70 000 | $13.95 | $976,500 | $1,097,600 |
| 10/30/01 | Lawrence Oglesby | 66,666 | $13.95 | $929,990 | $1,045,322 |

| 10/30/01 | Gary Moss. | 50,000 | $13.95 | $697,500 | $784,000 |

## Backdated FY 2002 (Oct. 7, 2002) Stock Option Grants

138.     During fiscal 2002, the trading price of KB Home common stock ranged from a

price of $16.69 to $26.45 per share, with a weighted average closing price of $23.08. A total of

1,500,000 split-adjusted options were purportedly granted on October 7, 2002, to at least four

executives, including defendant Karatz. The spilt-adjusted exercise price was $21.51 per share,

which is $1.57 less than the weighted average closing price for the fiscal year. Just ten days after

the grant, the stock price soared to $25.62 per share, a 19.1% increase. The exercise price was

the second lowest price for the month of October 2002. A graph demonstrating the timing of this

grant follows below:



**KB Home**
**September 6, 2002 - November 7, 2002**

| Date | Executive | No. of Options Granted (split-adj.) | Exercise Price (split-adj.) | Total Grant Value at Date of Grant (split-adj.) | Total Grant Value 20 Trading Days After Grant (split-adj.) |
|------|-----------|------|------|------|------|
| 10/07/02 | Bruce Karatz | 1,000,000 | $21.51 | $21,510,000 | $25,620,000 |
| 10/07/02 | Jeffrey Mezger | 400,000 | $21.51 | $8,604,000 | $10,248,000 |
| 10/07/02 | John Goodwin | 60,000 | $21.51 | $1,290,600 | $1,537,200 |
| 10/07/02 | Robert Freed | 40,000 | $21.51 | $860,400 | $1,024,800 |

### Backdated FY 2004 (Oct. 22, 2004) Stock Option Grants

139.     During fiscal 2004, the trading price of KB Home common stock ranged from a price of $30.53 to $45.71 per share, with a weighted average closing price of $34.95. A total of 835,000 split-adjusted options were purportedly granted on October 22, 2004, to at least five executives, including KB Home's Chairman and CEO, defendant Karatz. The split-adjusted exercise price was $36.99 per share. The price of the stock 20 trading days after the grant was $42.33 per share, for a 20-day cumulative return based on the exercise price of 14.4%. Just ten days after the grant, the stock price soared to $40.73 per share, a 10.1% increase. The exercise price was the second lowest price for the month of October 2004. A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted (split-adj.) | Exercise Price (split-adj.) | Total Grant Value at Date of Grant (split-adj.) | Total Grant Value 20 Trading Days After Grant (split-adj.) |
|---|---|---|---|---|---|
| 10/22/04 | Bruce Karatz | 560,000 | $36.99 | $20,714,400 | $23,704,800 |
| 10/22/04 | Jeffrey Mezger | 200,000 | $36.99 | $7,398,000 | $8,466,000 |
| 10/22/04 | Jay Moss | 25,000 | $36.99 | $924,750 | $1,058,250 |
| 10/22/04 | Robert Freed | 25,000 | $36.99 | $924,750 | $1,058,250 |
| 10/22/04 | Leah Bryant | 25,000 | $36.99 | $924,750 | $1,058,250 |

## Backdated FY 2005 (Oct. 18, 2005) Stock Option Grants

140.     During fiscal 2005, the trading price of KB Home common stock ranged from a

price of $46.01 to $84.40 per share, with a weighted average closing price of $63.94. A total of

347,000 options were purportedly granted on October 18, 2005, to at least four executives,

including KB Home's Chairman and CEO, defendant Karatz. The exercise price was $62.34 per

share, which is $1.60 less than the weighted average closing price for the fiscal year. Just ten

days after the grant, the stock price soared to $65.40 per share, a 4.9% increase. The exercise

28

price was the lowest price for the month of October 2005. A graph demonstrating the timing of this grant follows below:



| Date | Executive | No. of Options Granted (split-adj.) | Exercise Price (split-adj.) | Total Grant Value at Date of Grant (split-adj.) | Total Grant Value 20 Trading Days After Grant (split-adj.) |
|---|---|---|---|---|---|
| 10/18/05 | Bruce Karatz | 250,000 | $62.34 | $15,585,000 | $16,350,000 |
| 10/18/05 | Jeffery Mezger | 75,000 | $62.34 | $4,675,500 | $4,905,000 |
| 10/18/05 | Jay Moss | 8,000 | $62.34 | $498,720 | $523,200 |
| 10/18/05 | Robert Freed | 8,000 | $62.34 | $498,720 | $523,200 |
| 10/18/05 | James Widner | 6,000 | $62.34 | $374,040 | $392,400 |

141.    Overall, between 2001 and 2005, there were numerous backdated option grants at KB Home. Backdated "in-the-money" options were granted during that period to KB Home's top executives. All of the grants made by and/or to Defendants during the Class Period were granted at or near the lowest price for the month or quarter. Because the odds of such an occurrence happening randomly are so remote, and the only likely explanation for this pattern was that the stock options had been backdated, on November 12, 2006, KB Homes publicly

admitted for the first time that its stock option grants used improper measurement dates and will require its financial statements to be restated.

142.    Backdating the date of issuance of the executive stock options violated KB Home's stock option plans, which provided that the exercise price of options to purchase KB Home common stock shall not be less than 100% of the fair market value on the date of grant. See 1996 Proxy at 21 ("All options were granted at market value on the date of grant."); 1997-2006 Proxies at 23, 21, 26, 26, 26, 31, 29, 38, 38, 45, respectively (same).

143.    It also directly contradicted the public disclosures in KB Home's SEC Reports on Form 10-K which defendants Karatz, Johnson, Irani and Moonves signed at various times.

144.    The secret practice of backdating stock option grants to themselves and their colleagues and issuing false statements to Participants, breached Defendants' fiduciary duties, including their duties of good faith, honesty and loyalty, owed to the Plan and its Participants.

145.    The backdating scheme enabled Defendants to disguise the fact that the Company was paying higher compensation to executives and employees by awarding "in-the-money" options and avoiding having to expense the "in-the-money" portion as compensation expense and thus avoid reductions in the Company's net income.  Keeping the scheme secret also hid the injury to the Company which occurred when executives and employees exercised the options and made capital contributions to KB Home that were less than they should have paid, had the options not been granted "in-the-money."

146.    The scheme also conferred great personal financial benefits to Defendants. Before the disclosure of Defendants' stock option backdating scheme, KB Home stock traded at prices as high as $84.40 per share, propelled in large part by the admittedly false financial statements that Defendants had caused KB Home to issue.  While the price of KB Home stock

was artificially inflated, *Defendants engaged in a massive insider trading bailout, selling more than $248 million worth of KB Home stock. For example, KB Home's Chairman and CEO, defendant Karatz, alone sold more than 5.7 million KB Home shares valued at over $230.4 million.*

### Defendants' False and Misleading Statements

147.   Defendants caused KB Home to send shareholders (including Participants) proxy statements in connection with the Company's 1996-2006 annual shareholder meetings. The proxy statements typically concerned the election of directors, the approval and adoption of KB Home's stock option plan, and ratification of the selection of KB Home's auditor.

148.   As KB Home's directors and top officers, Defendants drafted and/or approved all of KB Home's proxy statements during that period. They also approved each proxy statement before it was filed with the SEC.

149.   As a direct and proximate result, Defendants knew, or were deliberately reckless in not knowing, that the proxy statements contained materially false and misleading information about KB Home's stock option awards and stock option granting practices and procedures, as detailed below.

### 2001 Proxy Statement

150.   On or about March 8, 2001, Defendants caused the Company to file a Form 14A proxy statement with the SEC.

151.   In the proxy statement (which included a cover letter from defendant Karatz), the KB Home Board of Directors, through its Personnel, Compensation and Stock Plan Committee (defendants Johnson and Irani), made the following representations regarding the purposes of the Company's stock option plans:

COMPENSATION PHILOSOPHY AND OBJECTIVES

31

The Company designs executive compensation to attract and retain top-quality executive talent and to provide incentives for them to build stockholder wealth and to achieve the Company's annual business plan. To this end, the Compensation Committee is guided by the Company's executive compensation philosophy which is based on a total compensation approach, which requires constant analysis of both annual and long-term compensation and which is intended to:

--     Closely link compensation to the creation of stockholder value;

--     Encourage stock ownership by executives to directly align executive interests with stockholder interests;

--     Reward contributions that further the Company's mission by aligning individual performance measures with the Company's performance objectives; [and]

                    *        *        *

--     Attract, retain and motivate executives of the highest quality.

                    *        *        *

Long-Term Incentive Compensation. Long-term incentive compensation is generally awarded in the form of stock option grants. . . .

By providing executives with an ownership stake in the Company, stock options are intended to align executive interests with stockholder interests and to motivate executives to continually improve the long-term performance of the Company.

152.    The KB Home Board also made the following representation regarding the pricing of options granted to KB Home executives during the last fiscal year:

**All options were granted at market value on the date of grant.** The term "market value" as used with respect to this table was computed as the average of the high and low stock prices for the Company's Common Stock on the New York Stock Exchange on the date of grant.

(Emphasis added).

32

153.    Further, the KB Home Board of Directors presented the 2001 Stock Incentive

Plan ("2001 Plan") for shareholder approval.

154.    In connection with the proposal, the Board of Directors made the following

representations about the administration of the 2001 Plan:

> On February 1, 2001, the Company's Board of Directors adopted
> the KB Home 2001 Stock Incentive Plan (the "2001 Plan"), subject
> to approval by the Company's stockholders.
>
> The 2001 Plan is intended to replace the Company's stockholder-
> approved incentive plans (the KB Home 1998 Employee Stock
> Plan and KB Home Performance-Based Incentive Plan for Senior
> Management) . . . . Under the proposed 2001 Plan, the Company
> may grant to eligible employees stock options. . . . The 2001 Plan
> will support the Company's ongoing effort to align the interest of
> management and other key employees with those of the
> Company's stockholders by providing incentives that are directly
> linked to the profitability of the Company's business and increases
> in stockholder value. **ACCORDINGLY, THE 2001 PLAN
> WILL FORM AN IMPORTANT PART OF THE
> COMPANY'S OVERALL COMPENSATION PROGRAM,
> AND YOUR BOARD OF DIRECTORS RECOMMENDS A
> VOTE "FOR" THIS PROPOSAL.**

(Emphasis in original).

155.    Each of the above statements concerning the purposes of KB Home's stock option

plans and the value of the stock options on the date of grant were false and misleading because

KB Home had, in fact, backdated option grants to KB Home insiders, which was not permitted

by KB Home's stock option plans.

**The 2001 Form 10-K**

156.    On or about February 28, 2002, Defendants caused the Company to file its 2001

Report on Form 10-K with the SEC (the "2001 10-K").

157.    The 2001 10-K included KB Home's financial statements for the period ended

November 30, 2001, which were materially false and misleading and presented in violation of

GAAP, due to improper accounting for backdated stock options grants. As a result, KB Home's compensation expense was understated and its net income and earnings were overstated.

158. In addition, the 2001 10-K included the following representations about KB Home's accounting for stock options:

> The Company's employee stock option plans are accounted for under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB Opinion No. 25").

> \* \* \*

> [SFAS No. 123], issued in October 1995, established financial accounting and reporting standards for stock-based employee compensation plans. As permitted by SFAS No. 123, the Company elected to continue to use APB Opinion No. 25 and related interpretations in accounting for its stock options.

159. These statements were false and misleading because the Company did not report the excess compensation expense arising from the secret options backdating scheme detailed herein.

160. The 2001 10-K was signed by defendants Karatz, Hollinger, Irani, Johnson, Nafilyan and Munitz.

## 2002 Proxy Statement

161. On or about March 1, 2002, Defendants caused the Company to file a Form 14A proxy statement with the SEC which included a cover letter from defendant Karatz.

162. In the proxy statement, the KB Home Board of Directors, through its Management Development and Compensation Committee (formerly known as the Personnel, Compensation and Stock Plan Committee) (defendants Irani and Munitz), made the following representations regarding the purposes of the Company's stock option plans:

COMPENSATION PHILOSOPHY AND OBJECTIVES

[…] The Management Development and Compensation Committee provides guidance, recommendations and approvals to executive compensation programs guided by the Company's executive compensation philosophy which is intended to:

--        Closely link executive compensation to the creation of stockholder value;

--        Encourage stock ownership by executives to directly align executive interests with stockholder interests; [and]

*        *        *

--        Attract, retain and motivate executives of the highest quality.

*        *        *

Long-Term Incentive Compensation. Long-term incentive compensation is generally awarded in the form of stock option grants. . . .

By providing executives with an ownership stake in the Company, stock options are intended to align executive interests with stockholder interests and to motivate executives to continually improve the long-term performance of the Company.

163.     The KB Home Board also made the following representation regarding the pricing of options granted to KB Home executives during the last fiscal year:

> ***All options were granted at market value on the date of grant.*** The term "market value" as used with respect to this table was computed as the average of the high and low stock prices for the Company's Common Stock on the New York Stock Exchange on the date of grant.

(Emphasis added).

164.     Each of the above statements concerning the purposes of KB Home's stock option plans and the value of the stock options on the date of grant were false and misleading because KB Home had, in fact, backdated option grants to KB Home insiders, which was not permitted by KB Home's stock option plans.

35

**The 2002 Form 10-K**

165.    On or about February 28, 2003, Defendants caused the Company to file is 2002 Report on Form 10-K with the SEC (the "2002 10-K").

166.    The 2002 10-K included KB Home's financial statements for the period ended November 30, 2002, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for backdated stock options grants. As a result, KB Home's compensation expense was understated and its net income and earnings were overstated.

167.    In addition, the 2002 10-K included the following representations about KB Home's accounting for stock options:

> The Company's employee stock option plans are accounted for under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB Opinion No 25").
>
> *          *          *
>
> SFAS No. 123, issued in October 1995, established financial accounting and reporting standards for stock-based employee compensation plans. As permitted by SFAS No. 123, the Company elected to continue to use APB Opinion No. 25 and related interpretations in accounting for its stock options.

168.    These statements were false and misleading because the Company did not report the excess compensation expense arising from the secret options backdating scheme detailed herein.

169.    The 2002 10-K was signed by defendants Karatz, Irani, Johnson, Munitz and Nafilyan.

**2003 Proxy Statement**

170.    On or about February 28, 2003, Defendants caused the Company to file a Form 14A proxy statement with the SEC which included a letter from defendant Karatz.

171.    In the proxy statement, the KB Home Board of Directors, through its

Management Development and Compensation Committee (formerly known as the Personnel,

Compensation and Stock Plan Committee) (defendants Irani and Munitz), made the following

representations regarding the purposes of the Company's stock option plans:

> COMPENSATION PHILOSOPHY AND OBJECTIVES
>
> [...] The Management Development and Compensation Committee
> of the Company's Board of Directors provides guidance,
> recommendations and approvals to executive compensation
> programs guided by the Company's executive compensation
> philosophy which is intended to:
>
> --      Closely link executive compensation to the creation of
>         stockholder value;
>
> --      Encourage stock ownership by executives to directly align
>         executive interests with stockholder interests; [and]
>
> *      *      *
>
> --      Attract, retain and motivate executives of the highest
>         quality.
>
> *      *      *
>
> Long-Term Incentive Compensation. Long-term incentive
> compensation is generally awarded in the form of stock option
> grants. . . .
>
> By providing executives with an ownership stake in the Company,
> stock options are intended to align executive interests with
> stockholder interests and to motivate executives to continually
> improve the long-term performance of the Company.

172.    The KB Home Board also made the following representation regarding the

pricing of options granted to KB Home executives during the last fiscal year:

> *All options were granted at market value on the date of grant.*
> The term "market value" as used with respect to this table was
> computed as the average of the high and low stock prices for the
> Company's Common Stock on the New York Stock Exchange on
> the date of grant.

(Emphasis added).

173.    Each of the above statements concerning the purposes of KB Home's stock option

plans and the value of the stock options on the date of grant were false and misleading because

KB Home had, in fact, backdated option grants to KB Home insiders, which was not permitted

by KB Home's stock option plans.

**The 2003 Form 10-K**

174.    On or about March 1, 2004, Defendants caused the Company to file its 2003

Report on Form 10-K with the SEC (the "2003 10-K").

175.    The 2003 10-K included KB Home's financial statements for the period ended

November 30, 2003, which were materially false and misleading and presented in violation of

GAAP, due to improper accounting for backdated stock options grants.  As a result, KB Home's

compensation expense was understated and its net income and earnings were overstated.

176.    In addition, the 2003 10-K included the following representations about KB

Home's accounting for stock options and the exercise price on those grants:

> The Company has elected to account for stock-based compensation
> using the intrinsic value method as prescribed by [APB Opinion
> No. 25] and related interpretations . . . . *As the exercise price of*
> *the Company's employee stock options equals the market price of*
> *the underlying common stock on the date of grant*, no
> compensation costs related to these awards are reflected in net
> income.

(Emphasis added).

177.    These statements were false and misleading because the Company did not report

the excess compensation expense arising from the secret options backdating scheme detailed

herein and because the options were not granted at an exercise price equal to the market price of

the stock on the date of the grant.

178.    The 2003 10-K was signed by defendants Karatz, Cecere, Irani, Johnson and Munitz.

**2004 Proxy Statement**

179.    On or about March 1, 2004, Defendants caused the Company to file a Form 14A proxy statement with the SEC which contained a letter from defendant Karatz.

180.    In the proxy statement, the KB Home Board of Directors, through its Management Development and Compensation Committee (formerly known as the Personnel, Compensation and Stock Plan Committee) (defendants Irani and Munitz), made the following representations regarding the purposes of the Company's stock option plans:

> COMPENSATION PHILOSOPHY AND OBJECTIVES
>
> […] The Management Development and Compensation Committee of the Company's Board of Directors provides guidance, recommendations and approvals to executive compensation programs guided by the Company's executive compensation philosophy which is intended to:
>
> --    Closely link executive compensation to the creation of stockholder value,
>
> --    Encourage stock ownership by executives to directly align executive interests with stockholder interests, [and]
>
> *       *       *
>
> --    Attract, retain and motivate executives of the highest quality.
>
> *       *       *
>
> Long-Term Incentive Compensation.  Long-term incentive compensation is generally awarded in the form of stock option grants. . . .
>
> By providing executives with an ownership stake in the Company, Stock option grants . . . are intended to promote stock ownership by Company executives as well as to motivate executives to enhance the Company's long-term stockholder value.

39

181.    The KB Home Board of Directors also made the following representation

regarding the pricing of options granted to KB Home executives during the last fiscal year:

> ***All options were granted at market value on the date of grant.***
> The term "market value" as used with respect to this table was
> computed as the average of the high and low stock prices for our
> Common Stock on the New York Stock Exchange on the date of
> grant.

(Emphasis added).

182.    Each of the above statements concerning the purposes of KB Home's stock option

plans and the value of the stock options on the date of grant were false and misleading because

KB Home had, in fact, backdated option grants to KB Home insiders, which was not permitted

by KB Home's stock option plans.

## The January 2005 Registration Statement

183.    On January 25, 2005, Defendants caused the Plan to file a Registration Statement

on Form S-8 which incorporated the following false and misleading statements by Defendants:

> **January 25, 2005**: (a) [KB Home's] Annual Report on Form 10-K
> for the year ended November 30, 2003; (b) [KB Home's] Quarterly
> Reports on Form 10-Q for the quarters ended February 29, 2004,
> May 31, 2004 and August 31, 2004; (c) [KB Home's] Current
> Reports on Form 8-K filed December 23, 2003, January 15, 2004,
> June 14, 2004, June 24, 2004 and December 15, 2004; and (d) the
> description of [KB Home's] common stock, par value $1.00 per
> share, in the Registrant's Registration Statement on Form 8-A filed
> June 30, 1986 pursuant to Section 12(b) of the Exchange Act, and
> the description of the Registrant's Rights to Purchase Series A
> Participating Cumulative Preferred Stock in the Registrant's
> Registration on Form 8-A filed February 23, 1999 pursuant to
> Section 12(b) of the Exchange Act, together with any amendment
> or report filed with the Commission for the purpose of updating
> such descriptions.

184.    This Form S-8 was signed by defendants Karatz, Johnson, Irani, Moonves, Cecere

and Munitz.

## The 2004 Form 10-K

185.    On or about February 14, 2005, Defendants caused the Company to file its 2004 Report on Form 10-K with the SEC (the "2004 10-K"). The 2004 10-K included KB Home's financial statements for the period ended November 30, 2004, which were materially false and misleading and presented in violation of GAAP, due to improper accounting for backdated stock options grants. As a result, KB Home's compensation expense was understated and its net income and earnings were overstated.

186.    In addition, the 2004 10-K included the following representations about KB Home's accounting for stock options and the exercise price on those grants:

> The Company has elected to account for stock-based compensation using the intrinsic value method as prescribed by APB Opinion No. 25 and related interpretations . . . . *As the exercise price of the Company's employee stock options equaled the market price of the underlying common stock on the date of grant,* no compensation costs related to these awards were reflected in net income.

(Emphasis added).

187.    These statements were false and misleading because the Company did not report the excess compensation expense arising from the secret options backdating scheme detailed herein and because the options were not granted at an exercise price equal to the market price of the underlying common stock.

188.    The 2004 10-K was signed by defendants Karatz, Cecere, Irani, Johnson Moonves and Munitz.

## 2005 Proxy Statement

189.    On or about February 24, 2005, Defendants caused the Company to file a Form 14A proxy statement with the SEC which contained a letter from defendant Karatz.

190.    In the proxy statement, Defendants, through the Board's Management

Development and Compensation Committee (formerly known as the Personnel, Compensation

and Stock Plan Committee) (defendants Irani, Johnson, Moonves and Munitz), made the

following representations regarding the purposes of the Company's stock option plans:

> COMPENSATION PHILOSOPHY AND OBJECTIVES
>
> The Management Development and Compensation Committee of
> the Company's Board of Directors provides guidance,
> recommendations and approvals regarding the Company's
> executive compensation programs.  The Company designs
> executive compensation around five key objectives, which
> comprise the Company's executive compensation philosophy:
>
> --    Closely link executive compensation to the creation of
>       stockholder value,
>
> --    Encourage stock ownership by executives to directly align
>       executive interests with stockholder interests, [and]
>
> --    Attract, retain and motivate executives of the highest
>       quality.
>
> Long-Term Incentive Compensation.  Long-term incentive
> compensation is generally awarded in the form of stock option
> grants. . . .
>
> By providing executives with an ownership stake in the Company,
> stock option and restricted stock grants are intended to align
> executive interests with stockholder interests and to motivate
> executives to continually improve the long-term performance of
> the Company.

191.    Defendants also made the following representation regarding the pricing of

options granted to KB Home executives during the last fiscal year:

> *All options were granted at market value on the date of grant.*
> The term "market value" as used with respect to this table was
> computed as the average of the high and low stock prices for the
> Company's Common Stock on the New York Stock Exchange on
> the date of grant.

42

(Emphasis added).

192.    Each of the above statements concerning the purposes of KB Home's stock option

plans and the value of the stock options on the date of grant was false and misleading because

KB Home had, in fact, backdated option grants to KB Home insiders, which was not permitted

by KB Home's stock option plans.

## The October 27, 2005 Registration Statement

193.    On October 27, 2005, Defendants caused the Plan to file a Registration Statement

on Form S-8 which incorporated the following false and misleading statements by Defendants:

> **October 27, 2005**: (a) [KB Home's] Annual Report on Form 10-K
> for the year ended November 30, 2004; (b) [KB Home's] Quarterly
> Reports on Form 10-Q for the quarters ended February 28, 2005,
> May 31, 2005 and August 31, 2005; (c) [KB Home's] Current
> Reports on Form 8-K filed December 15, 2004, May 13, 2005,
> June 2, 2005, and June 27, 2005; and (d) the description of [KB
> Home's] common stock, par value $1.00 per share, in the
> Registrant's Registration Statement on Form 8-A filed June 30,
> 1986 pursuant to Section 12(b) of the Exchange Act, and the
> description of the Registrant's Rights to Purchase Series A
> Participating Cumulative Preferred Stock in the Registrant's
> Registration on Form 8-A filed February 23, 1999 pursuant to
> Section 12(b) of the Exchange Act, together with any amendment
> or report filed with the Commission for the purpose of updating
> such descriptions.

194.    This Form S-8 was signed by defendants Karatz, Johnson, Irani, Moonves,

Cecere, Munitz and Cohen.

## The 2005 Form 10-K

195.    On or about February 10, 2006, Defendants caused the Company to file its 2005

Report on Form 10-K with the SEC (the "2005 10-K").

196.    The 2005 10-K included KB Home's financial statements for the period ended

November 30, 2005, which were materially false and misleading and presented in violation of

GAAP, due to improper accounting for backdated and misdated stock option grants. As a result,

43

KB Home's compensation expense was understated and its net income and earnings were overstated.

197.    In addition, the 2005 10-K made the following representations about KB Home's accounting for stock option and the exercise price of those grants:

> The Company has elected to account for stock-based compensation using the intrinsic value method as prescribed by APB Opinion No. 25 and related interpretations . . . . *As the exercise price of the Company's employee stock options equaled the market price of the underlying common stock on the date of grant*, no compensation costs related to these awards were reflected in net income.

(Emphasis added).

198.    These statements were false and misleading because Defendants did not report the excessive compensation expense arising from the secret backdating scheme and because the options were not granted at an exercise price equal to the market price of the underlying common stock.

199.    The 2005 10-K was signed by defendants Karatz, Cecere, Irani, Johnson, Moonves and Munitz.

**2006 Proxy Statement**

200.    On or about March 6, 2006, Defendants caused the Company to file a Form 14A proxy statement with the SEC, which included a letter from defendant Karatz.

201.    In the proxy statement, the KB Home Board of Directors, through its Management Development and Compensation Committee (formerly known as the Personnel, Compensation and Stock Plan Committee) (defendants Irani, Johnson and Moonves), made the following representations regarding the purposes of the Company's stock option plans:

COMPENSATION PHILOSOPHY AND OBJECTIVES

44

> The Management Development and Compensation Committee of
> the Company's Board of Directors oversees the Company's
> executive compensation programs. The Company designs its
> executive compensation programs around five key principles,
> which together comprise the Company's executive compensation
> philosophy.
>
> --   Closely link executive compensation to the creation of
>      stockholder value;
>
> --   Promote stock ownership by executives to directly align
>      their interests with stockholder interests; [and]
>
> --   Attract, retain and motivate executives of the highest
>      quality.
>
> Long-Term Incentive Compensation. Long-term incentive
> compensation is generally awarded in the form of stock option
> grants . . . . Stock option grants . . . are intended to promote stock
> ownership by Company executives as well as to motivate
> executives to enhance the Company's long-term stockholder value.

202.   The proxy statement also made the following representation regarding the pricing

of options granted to KB Home executives during the last fiscal year:

> ***All options were granted at market value on the date of grant.***
> The term "market value" as used with respect to this table was
> computed as the average of the high and low stock prices for our
> Common Stock on the New York Stock Exchange on the date of
> grant.

(Emphasis added).

203.   Each of the above statements concerning the purposes of KB Home's stock option

plans and the value of the stock options on the date of grant was false and misleading because

KB Home had, in fact, backdated option grants to KB Home insiders, which was not permitted

by KB Home's stock option plans.

**KB Home's False and Misleading Forms 10-K**

204.   Defendants' secret option backdating scheme caused each of KB Home's Forms

10-K for 2001 through 2005 to materially understate the Company's compensation expense and materially overstate its net income and understate its net loss, because Defendants failed to expense the "in-the-money" portion of KB Home's stock option grants during the period as required by APB 25.

205.    The Forms 10-K also falsely represented that "the exercise price of the Company's employee stock options equaled the market price of the underlying common stock on the date of the grant."

206.    Additionally, in the Company's Forms 10-K, Defendants made the following statement or a substantially similar statement regarding option grants and their accounting for stock options: "[T]he Company elected to continue to use Accounting Principles Board Opinion No, 25, 'Accounting for Stock Issued to Employees' and related Interpretations, in accounting for stock options." See 2001 - 2005 Forms 10-K.

207.    These statements were materially false and misleading in each of these years because KB Home had been granting options to Defendants and others at prices that were below fair market value on the date of grant. APB 25 required Defendants to record a compensation expense for options that were "in-the-money" on the date of grant but Defendants did not do so, thereby materially understating KB Home's compensation expense and materially overstating KB Home's earnings.

208.    These statements were designed to conceal, and did in fact conceal, the fact that Defendants were engaged in a continuous and systematic scheme of backdating stock option grants to KB Home insiders in violation of their fiduciary duties to the Plan and its Participants.

209.    The Company's reports on Form 10-K contained materially false and misleading historical financial statements from at least 2001 through 2005 due to Defendants' unlawful

backdating scheme.

210.    Each Defendant, including Karatz, who had received backdated options, approved and/or signed the Forms 10-K during this period.

211.    As KB Home's CEO and CFO, defendants Karatz (CEO) and Cecere (CFO) also signed Sarbanes-Oxley Act of 2002 § 302 certifications falsely stating that the Company's Forms 10-K from 2002 through 2005 did not contain any material misstatements or omit material information and that the reports fairly presented in all material respects the Company's financial condition and results of operations. These statements were untrue at the time they were made due to the unlawful stock option backdating scheme particularized herein.

212.    Defendants Karatz and Cecere should have known these certifications were materially false and misleading. KB Home's financial statements for those years did not fairly present the Company's financial condition because the Forms 10-K failed to account for Defendants' "in-the-money" grants as compensation expense and thus, materially overstated net income and earnings; and the Forms 10-K included materially false and misleading financial statements from previous years that understated compensation expenses due to earlier, disguised "in-the-money" option grants about which Defendants knew and/or approved.

## PLAN PARTICIPANTS LEARN
## ABOUT THE OPTIONS BACKDATING

213.    In May 2006, in response to various media reports that certain public companies had improperly backdated options, KB Home began a review of its options backdating practices.

214.    On August 24, 2006, KB Home disclosed that it had been notified by the SEC of an informal investigation into its historical stock options grants and procedures, including options grants to Company executives -- the same fiduciaries who were charged with administering the Plan.

215.    KB Home's internal review then progressed into a review by a subcommittee of

the Audit and Compliance Committee with the advice of counsel and forensic accountants.

216.    During the course of that process 66 interviews were conducted and more than 1.2

million documents were collected relating to the Company's options practices.

217.    The investigation revealed that defendant Karatz selected the improper grant dates

for the options and that "hindsight was used to secure favorable exercise prices for seven of the

eight annual stock option grants since 1998."

218.    In correspondence to the SEC, KB Home represented that the conduct of

defendant Karatz could be characterized as "self-dealing or misappropriation."

219.    Either way it is characterized, defendant Karatz's conduct violated his fiduciary

duties under ERISA and led to him obtaining more than $230 million for himself while violating

the trust placed in him by the Plan and its Participants.

220.    On November 12, 2006, the Company announced that its internal investigation

had concluded that for nearly a decade, stock options granted by the Company had been

backdated or otherwise improperly priced:

> The investigation has concluded that the Company used incorrect
> measurement dates for financial reporting purposes for annual
> stock option grants during the period from 1998 to 2005.

221.    Then, on December 7, 2006, KB Home publicly admitted that its fiscal 1999

through 2005 financial statements (which had been incorporated into Plan documents and

communications to Participants) contained materially false statements and therefore "should no

longer be relied upon and will be restated."

222.    The Company announced that it was unable to file its required financial reports

with the SEC, would need to restate its financial results, and that the internal investigation had

concluded that the Company (including defendant Karatz and the head of Human Resources) had

48

engaged in the improper backdating of options.

223.    As a result of the investigation, KB Home increased by $72.3 million its accrued expenses and other liabilities relating to the options backdating and it restated its financial results for the years ended November 30, 2005 and 2004, and made adjustments to its financials from 1999 through 2005.

224.    In the wake of these disclosures, defendant Karatz resigned or was terminated from KB Home and the Company's Chief Legal Officer as well as its Vice President of Human Resources resigned or were terminated.

225.    In January 2007, these SEC's informal investigation became a formal investigation.

## THE INSIDER SALES

226.    Between 1996 and 2006, *certain defendants exercised their stock options and sold their stock for proceeds of more than $248 million,* including the following:

| Defendant | Date of Sales | Shares Sold | Proceeds Received |
|---|---|---|---|
| KARATZ | 02/07/01-07/13/05 | 5,750,542 | $230,479,062 |
| HOLLINGER | 02/07/01-12/21/04 | 290,658 | $11,644,015 |
| JOHNSON | 12/11/00 | 26,000 | $483,860 |
| NAFILYAN | 02/12/96-05/03/02 | 368,000 | $5,406,900 |
| **TOTAL** | | **6,435,200** | **$248,013,837** |

227.    During this time, these defendants were causing the Plan and its Participants to acquire and hold KB Home stock using Plan assets.

228.    As a result, these defendants were selling their stock to the Plan at inflated prices and received Plan assets in return.

49

## THE COMPANY BENEFITED FROM
## THE BACKDATING SCHEME

229. The individual defendants were not the only ones to benefit from the backdating scheme and the related misrepresentations and omissions.

230. KB Home also benefited from the scheme in many different ways.

231. First, because of the scheme, KB Home was able to use "in-the-money" backdated options to attract and retain employees.

232. Second, because of the scheme, KB Home was able to report artificially inflated financial results which made it appear that the Company was performing better than it actually was. During the Class Period, KB Home was able to understate its expenses and overstate its earnings.

233. Third, because of the scheme, the Company was able to inflate its stock price by causing the Plan to acquire and hold KB Home stock using Plan assets.

234. Fourth, because of the scheme, KB Home was able to raise money in the markets and to pay lower interest on its debt than would have been possible if Defendants had disclosed the truth about KB Home's options practices and financial results.

235. By concealing the options backdating scheme, KB Home was able to complete the following transactions which provided KB Home with significant capital on favorable terms:

      (a) On February 8, 2001, the Company raised $250 million by issuing 9 1/2% senior subordinated notes and using the proceeds to pay down bank borrowings;

      (b) On December 14, 2001, the Company issued $200 million of 8 5/8% senior subordinated notes due December 15, 2008 and used $175 million of the net proceeds to redeem all of KB Home's outstanding 9 3/8% senior subordinated notes due 2003;

      (c) On January 27, 2003, the Company issued $250 million of 7 3/4% senior subordinated notes and on February 7, 2003, it issued an additional $50

million of notes in the same series. The Company used $129.0 million of the net proceeds to redeem all of its outstanding $125.0 million 9 5/8% senior subordinated notes due 2006.

(d)     On January 28, 2004, the Company issued $250 Million Senior Notes in a private placement. The Company used all of the net proceeds from the issuance of the $250 Million Senior Notes to repay borrowings outstanding under the $1 Billion Credit Facility.

(e)     On June 29, 2004, the Company's mortgage banking subsidiary entered into the $150 Million Mortgage Warehouse Facility with a bank syndicate to replace another revolving mortgage warehouse agreement.

(f)     On October 6, 2004, the Company's mortgage banking subsidiary entered into the $300 Million Master Loan and Security Agreement with an investment bank. The agreement replaced another banking agreement which was expiring.

(g)     On November 22, 2005, KB Home entered into a senior unsecured five-year $1.5 billion revolving credit facility.

(h)     On April 12, 2006, KB Home entered into a five-year $400 million term loan.

## DAMAGES TO THE PLAN AND ITS PARTICIPANTS

236.    As a result of Defendants' breaches of fiduciary duty, the Plan and its Participants have been damaged.

237.    Because of Defendants' breaches, the Plan and its Participants acquired KB Home stock at artificially inflated prices when it was imprudent to do so and at prices that were significantly more than the prices at which Defendants were acquiring the stock.

238.    Because of Defendants' breaches, the Plan and its Participants invested in KB Home stock and continued to hold it in the Plan instead of investing in other, alternative investments which were available through the Plan.

239.    During the Class Period, KB Home's stock was the largest investment held by the Plan.

240.    Had Defendants invested the Plan's assets in alternative investments, Plaintiffs and the Plan would have profited instead of incurring losses in the KB Home stock.

241.    The Plan and its Participants have lost profits because of Defendants' fiduciary breaches.

242.    Plaintiffs are asserting claims for "lost profits" under ERISA, including any profit that would have accrued to the Plan and its Participants if there had been no breach of fiduciary duty by Defendants.

243.    Plaintiffs' claims for lost profits include profits foregone by the Plan and its Participants because defendant fiduciaries allowed the Plan to invest in KB Home stock when it was imprudent to do so.

244.    When the market learned about the options backdating scheme and Defendants' violations of fiduciary duty, the price of KB Home stock dropped significantly, taking with it the value of the vested retirement benefits in the Plan.

245.    Plaintiffs and the Plan also have been damaged by investing Plan assets in KB Home stock because after the market learned the truth about the options backdating at KB Home, the value of KB Home's stock and the retirement funds in the Plan declined significantly which deprived Participants of their vested retirement benefits.

246.    Plaintiffs Bagley and Silver cashed out of the Plan on December 22, 2006 and October 30, 2006, respectively, which was after KB Home's stock price dropped in response to the Company's announcement in August, 2006 about the SEC's investigation into KB Home's options backdating practices.

247.    Plaintiff Hughes cashed out of the Plan on December 4, 2006, which is after the stock dropped in response to the announcements by the Company in August and November 2006

52

about the options backdating practices.

248.    By the time that plaintiff Beck cashed out of the Plan in 2007, this action had already been filed on behalf of the Plan and its Participants, including plaintiff Beck, and the stock price had dropped significantly.

249.    Each plaintiff was a Plan Participant until <u>after</u> the scheme was revealed and <u>after</u> KB Home's stock price dropped, taking with it the value of the Plan's investment in KB Home stock.

250.    As a result, each plaintiff incurred a loss in the Plan which can be redressed through this lawsuit.

251.    During the Class Period, KB Home's stock traded at prices as high as $80 per share.

252.    Following the disclosures in 2006 about options backdating, KB Home's stock price dropped to approximately $40 per share and continued to drop.

253.    KB Home's stock now trades at approximately $24 per share.

### **KB HOME STOCK WAS NOT A PRUDENT PLAN INVESTMENT**

254.    Defendants did not effectively inform the Plan or its Participants of the past, immediate, and future dangers of investing in Company stock or units in the KB Home Stock Fund.

255.    In addition, Defendants, as fiduciaries responsible for monitoring the investment of Plan assets, failed to adequately review the performance of the Committee to ensure that it and its members were fulfilling their fiduciary duties under the Plan and ERISA.

256.    Defendants failed to conduct an appropriate investigation into whether KB Home stock was a prudent investment for the Plan and, in connection therewith, failed to provide the

53

Plan Participants with information regarding KB Home's improper activities so that Participants could make informed decisions regarding KB Home stock in the Plan, or otherwise failed to protect the Plan and its Participants against inevitable loss in vested benefits.

257. An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in KB Home stock offered by the Plan, under these circumstances, was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect Participants against unnecessary loss of vested benefits, and would have made a different investment decision.

258. Defendants had an obligation to protect the Plan and its Participants from the unreasonable and entirely predictable loss of vested benefits incurred as a result of the Plan's investment in Company stock and units.

259. Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of Company stock and units; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve Participants in the Plan in connection with the Plan's acquisition and holding of Company stock.

260. Despite the availability of these and other options, Defendants failed to take any action to protect the Plan or its Participants from a loss of vested benefits as a result of Plan investment in KB Home stock.

54

### DEFENDANTS REGULARLY COMMUNICATED WITH PARTICIPANTS IN THE PLAN CONCERNING KB HOME STOCK OFFERED BY THE PLAN, YET FAILED TO DISCLOSE THE IMPRUDENCE OF INVESTING IN COMPANY STOCK

261.    Upon information and belief, the Company regularly communicated with employees, including Participants in the Plan, about the performance, future financial and business prospects of the Company's common stock.  During the Class Period, the Company fostered a positive attitude toward the Company's stock and/or allowed Participants in the Plan to follow their natural bias towards investing in the equities of their employer by not disclosing negative material information concerning investing in the Company's stock and units.  As such, Participants in the Plan could not appreciate the true risks presented by investing in the Company's stock and units and therefore could not make informed decisions regarding their investments in the Plan.

262.    As noted above, these SEC filings and related statements and releases were inaccurate, incomplete and materially misleading, causing the Plan and its Participants to purchase, hold and maintain Plan investments in KB Home stock and units.

263.    Defendants failed to provide Plan Participants with complete and accurate information regarding KB Home stock, such that the Participants could appreciate the true risks presented by investing in KB Home stock and units and could make informed decisions regarding investing in the Plan.

## TOLLING OF APPLICABLE LIMITATION PERIODS

264.    The claims asserted herein are timely.

265.    As an initial matter, Defendants wrongfully concealed their manipulation of KB Home's stock option plans by systematically issuing false and misleading proxy statements, by falsely reassuring Plan Participants that KB Home's option grants were being administered by a committee of independent directors, and by failing to disclose that backdated options were, in fact, actually issued on dates other than those disclosed, and that strategically-timed option grants were issued based on the manipulation of insider information that ensured the true fair market value of the Company's stock was, in fact, higher than the publicly traded price on the date of the option grant.

266.    The Plan and its Participants had no reason to know of Defendants' breach of fiduciary duties until at least August 2006, when it was announced that the SEC had commenced an investigation into KB Home's stock option practices.

267.    The statute of limitations for the claims asserted in this Amended Complaint were also tolled by the filing of class actions against KB Home and some of the defendants in this action.

268.    As fiduciaries of the Plan and its Participants, Defendants cannot rely on any limitations defense where they withheld from the Plan and its Participants the facts that give rise to the claims asserted herein, i.e., that the option grant dates to Defendants had been manipulated to maximize the profit for the grant recipients and that Defendants had issued false and misleading statements which have damaged the Plan and its Participants.

## CLAIMS FOR RELIEF UNDER ERISA

269.    During the Class Period, Defendants were, and acted as, fiduciaries within the

meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

270.    ERISA § 502, 29 U.S.C. § 1132, provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

271.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

272.    ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

273.    These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan (including in this instance company stock) and to ensure that each investment is a suitable option for the plan; and

57

(b)      A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

274.      ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co fiduciary," provides, in pertinent part, that:

> ". . . in addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 1104(a)(1) [29 U.S.C. § 1104(a)(l)] of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless be makes reasonable efforts under the circumstances to remedy the breach."

275.      Plaintiffs and the Plan therefore bring this action under the authority of ERISA § 502 for Plan-wide relief pursuant to ERISA § 409(a) to recover the loss of vested benefits sustained by the Plan arising out of the breaches of fiduciary duties by Defendants.

## COUNT I

276.      Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

277.      During the Class Period, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

278.      As alleged above, Defendants were all responsible in different ways and to differing extents, for the selection, maintenance and monitoring of the Plan's investment options,

58

including the option of Company stock and units.

279.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in KB Home stock and units in the Plan were prudent and are liable for the loss of vested benefits incurred as a result of such investments being imprudent.

280.    Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan to do so.

281.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, these Defendants knew or should have known that KB Home stock was not a suitable and appropriate investment for the Plan as described herein for either (i) KB Home stock purchased through participant contributions to the Plan or (ii) KB Home stock and units accumulated by the Plan through Company matching contributions.

282.    Nonetheless, during the Class Period, these fiduciaries continued to offer the KB Home stock as an investment option for the Plan and to direct and approve Plan investment in KB Home stock and units, instead of in cash or other investments.

283.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan Participants and beneficiaries, from suffering a loss of vested benefits as a result of the Plan's investment in KB Home stock.

284.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

285.    Defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in, making no effort to remedy, and/or knowingly undertaking to conceal, their fellow Defendants' failure to prudently and loyally manage Plan assets in the exercise of their discretion with respect to the offering Company stock and units as an investment option in the Plan despite knowing that such failures were breaches of their ERISA mandated fiduciary duties.

286.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

287.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the lost profits and loss of vested benefits to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

288.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

289. During the Class Period, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 20 U.S.C. § 1002(21)(A).

290. During the Class Period, as alleged above, the scope of the fiduciary responsibility of Defendants included the responsibility to monitor other fiduciaries.

291. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that meant that Defendants, as the monitoring fiduciaries, had the duty to:

a. Ensure that the monitored fiduciaries possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan Participants;

b. Ensure that the monitored fiduciaries had ready access to such outside, impartial advisors, counsel, and experts when needed;

c. Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

d. Ensure that the monitored fiduciaries had adequate information and to do their job of overseeing the Plan investments;

e. Ensure that the monitored fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to Plan investment options; and

f. Ensure that the monitored fiduciaries reported regularly to the Company. The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

292.     Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to investing plan assets, and must take prompt and effective action to protect the plan and participants when they are not. The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the plan.

293.     The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the Plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to Plan Participants or for deciding whether to retain or remove them.

294.     Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

295.     Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business improprieties alleged above, which made Company stock and units an imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries appreciated the huge risk inherent in the significant investment by rank and file employees in an undiversified employer stock fund.

296.     Defendants knew or should have known that the fiduciaries they were responsible for monitoring were imprudently allowing the Plan to continue offering the KB Home stock and units as a Plan investment, and continuing to invest in KB Home stock and units when it no longer was prudent to do so, yet failed to take action to protect the Participants from the consequences of these fiduciaries' failures.

297.     In addition, Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition and practices of the Company that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, Defendants breached their monitoring duties under the Plan and ERISA.

298.     Defendants are liable as a co-fiduciaries because: (a) they knowingly participated in the fiduciary breaches by their fellow defendant fiduciaries in the activities implicated in this Count; (b) they enabled the breaches by these defendants; and (c) they had knowledge of these breaches yet failed to make any effort to remedy them.

299.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

300.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the lost profits and loss of vested benefits to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

301. Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

302. During the Class Period, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

303. During the Class Period, the scope of the fiduciary responsibility of Defendants included Plan communications and material disclosures.

304. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that Participants need in order to exercise their rights and interests under the plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding plan investment options, such that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan. This duty applies to all Plan investment options, including investing in KB Home stock.

305. Because investment in the Plan was not diversified (i.e., Defendants chose to invest the Plan's assets, and/or allow those assets to be invested, so heavily in KB Home stock and units), such investment carried with it an inherently high degree of risk. This inherent risk made Defendants' duty to provide complete and accurate information particularly important with respect to KB Home stock and units.

306. Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding KB Home and its stock, the Company's business improprieties, public misrepresentations and inflated earnings, and the consequent artificial

inflation of the value of KB Home stock and, generally, by conveying inaccurate information regarding the soundness of KB Home stock and the prudence of investing retirement contributions in KB Home equity. These failures were particularly devastating to the Plan and the Participants and had an enormous impact on the value of Participants' retirement assets.

307.    Defendants in this Count are also liable as co-fiduciaries because (a) they knowingly participated in or knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding KB Home stock, despite knowing of their breaches; (b) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; or (c) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to Participants, yet did not make any effort to remedy the breaches.

308.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above described statements, acts and omissions of Defendants constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in KB Home stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in KB Home stock during the Class Period. Plaintiffs and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of Defendants as described herein.

309.    Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

310.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

311.     Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the lost profits and the loss of vested benefits to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

312.     Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Company stock and units.

313.     As a consequence of Defendants' breaches, the Plan suffered a significant loss in vested benefits.

314.     Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for:

A.     A declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to Plaintiffs and the Participants;

B.     An Order compelling Defendants to make good to the Plan all lost profits and loss of vested benefits to the Plan resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's

assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

        C.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan or any Participant as the result of breaches of fiduciary duty;

        D.      An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

        E.      An Order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Company stock and units maintained by the Plan in proportion to the accounts' loss of vested benefits attributable to the decline in the price/value of Company stock and units;

        F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

        G.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

        H.      An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

Dated: April 2, 2008

                           **KELLER, FISHBACK & JACKSON LLP**

By: _____

                  Daniel L. Keller (SBN 191738)
                  28720 Roadside Drive, Suite 201
                  Agoura Hills, California 91301
                  Tel: (818) 879-8033
                  Fax: (818) 292-8891

**SQUITIERI & FEARON, LLP**
Stephen J. Fearon, Jr.
32 East 57th Street, 12th Floor
New York, New York 10022
Tel (212) 421-6492
Fax (212) 421-6553

**GAINEY & MCKENNA**
Thomas J. McKenna
295 Madison Avenue, 4th Floor
New York, New York 10017
Tel: (212) 983-1300
Fax: (212) 983-0383

## **CERTIFICATE OF SERVICE**

I, Cathy McNally hereby certify that on April 3, 2008, I caused the accompanying

Amended Class Action Complaint For Violations Of The Employee Retirement Income

Security Act to be served upon counsel listed below by E-Mail:

*For Defendant KB Home*

**Karen J Fessler**
Munger Tolles and Olson
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071
213-683-9147
Email: karen.fessler@mto.com

**Marc T G Dworsky**
Munger Tolles and Olson
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
213-683-9100
Email: DworskyMT@MTO.com

**Mark D Wincek**
Kilpatrick Stockton
607 14th Street NW, Suite 900
Washington, DC 20005-2018
202-508-5800
Email: MWincek@KilpatrickStockton.com

**Matthew A Olson**
Kilpatrick Stockton LLP
607 14th Street, NW, Suite 900
Washington, DC 20005-2018
Email: MOlson@KilpatrickStockton.com

**COPY**

**Ronald K Meyer**
Munger Tolles and Olson
355 South Grand Avenue, 35th Floor
Los Angeles, CA 90071-1560
213-683-9100
Email: Ronald.Meyer@mto.com

*For Defendant KB Home 401(k) Savings Plan Committee, James A Johnson, Ray A Irani,*
*Luis G Nogales, Ron Burkle, Kenneth M Jastrow, II, J Terrence Lanni, Michael G*
*McCaffery, Melissa Lora, Leslie Moonves, Timothy W Finchem, Guy Nafilyan, Domenico*
*Cecere, Cory F Cohen, William R Hollinger, Barry A Munitz, Sanford C Sigoloff, Henry*
*G Cisneros*

**Dean J Kitchens**
Gibson Dunn & Crutcher
333 S Grand Ave, 45th Fl
Los Angeles, CA 90071-3197
213-229-7000
Email: dkitchens@gibsondunn.com

**Michael M Farhang**
Gibson Dunn and Crutcher
333 South Grand Avenue, Suite 4600
Los Angeles, CA 90071-3197
213-229-7000
Email: mfarhang@gibsondunn.com

**Paul Blankenstein**
Gibson Dunn & Crutcher LLp
1050 Connecticut Avenue, NW
Washington, DC 20036
202-955-8500
Email: pblankenstein@gibsondunn.com

*For Defendant Bruce Karatz*

**Andrew A Esbenshade**
**Michael J Proctor**
**Christopher G Caldwell**
Caldwell Leslie & Proctor
1000 Wilshire Blvd, Ste 600
Los Angeles, CA 90017
213-629-9040
Email: esbenshade@caldwell-leslie.com

**Benjamin B Au**
**John W Keker**
Keker & Van Nest
710 Sansome Street
San Francisco, CA 94111-1704
415-391-5400
Email: bau@kvn.com

/s/Cathy McNally
Cathy McNally